Filed 8/6/21  P. v. Tidwell CA1/3

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE,<br><br>        Plaintiff and Respondent,<br><br>v.<br><br>ROY LINN TIDWELL,<br><br>        Defendant and Appellant. | A158243<br><br><br>(Napa County<br>Super. Ct. No. 18CR003274) |

        This is an appeal from final judgment after a jury convicted defendant Roy Linn Tidwell of one count of forcible lewd conduct upon a child under age 14.  Defendant raises three instructional challenges on appeal.  These relate to:  (1) defense counsel's failure to request a limiting instruction regarding the proper use of fresh complaint testimony; (2) the propriety of giving CALCRIM No. 361, which permitted the jury to draw an adverse inference from defendant's failure to explain or deny incriminating evidence; and (3) the constitutionality of CALCRIM No. 1193, which permitted the jury to consider expert testimony on child sexual abuse accommodation syndrome. We affirm.

1

## FACTUAL AND PROCEDURAL BACKGROUND

On December 7, 2018, an information was filed charging defendant with one count of forcible lewd act upon K.D.,[1] a child under age 14, in violation of Penal Code section 288, subdivision (b)(1).[2]  The information further alleged that defendant committed the crime through force or fear (§ 1203.066, subd. (a)(1)) and that the crime involved substantial sexual conduct (§ 1203.066, subd. (a)(8)).

### I.     *Prosecution's Case.*

### A.     K.D.

K.D., 19 years old at trial, was raised by her mother, T.D., in a small house in American Canyon.  When K.D. was about four years old, T.D. began dating defendant, and a few years later he moved into their house.

When K.D. was about six years old, defendant began exposing his penis to her.  This occurred about 10 separate times, when T.D. was elsewhere inside the house.  K.D. did not disclose defendant's indecent exposures because she feared him.

On November 15, 2007, when K.D. was about seven years old, she spent the evening alone in the house with defendant while T.D. was at the hospital with her ailing grandfather.  K.D. was in her room, playing with dolls, when defendant entered and led her into the other bedroom.  He threw K.D. onto the bed and rubbed her vagina over her pajamas.  While K.D. struggled, defendant, smelling of alcohol, held her down and kissed her on the mouth.  He then put his hand under her pajamas, but over her underwear, and rubbed her vagina.  K.D. tried to escape, but defendant

---

[1] To protect this child victim's privacy, we do not refer to her name. (Cal. Rules of Court, rule 8.90.)

[2] Unless otherwise stated, all statutory citations are to the Penal Code.

2

grabbed her by the hair, pushed her back on the bed and continued rubbing her vagina. The assault ended when T.D. telephoned to report that her grandfather had died. K.D. did not tell T.D. that defendant molested her because she was scared and she knew T.D. loved defendant.

K.D. subsequently suffered a series of panic attacks due to defendant's sexual assault. While defendant never directly acknowledged the incident, he often inexplicably apologized to K.D. He continued to live with K.D. and T.D. on and off until 2015.

In 2016, K.D. finally disclosed defendant's crime, telling her cousin, R.D., some of the details. Later that same year, K.D. disclosed the crime to her sisters, A.H. and L.M. Then, in 2017, she disclosed the crime to T.D., reserving the details for a subsequent letter written to her mother on August 13, 2017. This letter stated, in relevant part:

"I know you want to know what happened, so I'm going to tell you. . . .

"I was playing in my room and I remember him coming into my room and saying something to me, but I cant remember what was said. A lot of the event I cant remember, I only remember the major parts.

"The next thing I remember was him throwing me on your bed and he started touching my vagina. I tried getting up to go back to my room, but thats when he pushed me back down a stuck his tongue down my throat. It was disgusting. The smell of alcohol and cigarettes was overwhelming and I felt like I couldnt breathe. I remember him continuing to rub my vagina on top of my underwear and me crying and praying for it to end.

3

"The next thing I remember was the phone ringing and talking to you and finding out that great grandpa passed away. Thats all I remember." (*Sic.*)[3]

## B.  T.D.

T.D. testified about an incident when K.D. was eight or nine years old. One night, T.D. heard defendant get out of bed. A few minutes later, T.D. thought defendant had called to her, so she left her bed and went into the adjacent hallway. There, T.D. saw defendant with his hands in front of his sweat pants; K.D. was standing nearby, looking "petrified" and "hugging the wall" as if trying to make herself invisible. T.D. grabbed K.D. and took her outside to the porch. T.D. asked K.D. what happened, and K.D. "just kept saying" that she "didn't see anything."

T.D. sent K.D. to her grandfather's house. When she returned, T.D. asked defendant what happened. Initially, defendant stated that nothing happened, but he eventually admitted that he exposed his penis in K.D.'s presence. He insisted that he believed he was exposing himself to T.D., not K.D. Confused, T.D. ordered defendant to move out.

About a year later, defendant showed up at T.D.'s house and needed a place to stay. He apologized for the late-night incident, insisting he was "drunk" and "didn't mean it" and promising it "would never happen again." Because she still loved defendant, T.D. allowed him to move back in.

T.D. also testified about the charged incident, which occurred on November 15, 2007, the day her grandfather died. T.D. went to the hospital to visit him; after his passing, she called K.D., who was at home with defendant. When T.D. returned later that evening, K.D. was asleep in her

---

[3] K.D. testified at trial she only remembered that defendant kissed her and could not recall whether he stuck his tongue down her throat.

bedroom and defendant was outside, drinking. T.D. observed nothing unusual.

T.D. and defendant permanently separated in or around October 2016, when a serious argument culminated in the police removing defendant from her home. Several months later, in March 2017, K.D. finally told T.D. about the November 2007 sexual assault. K.D., crying and upset, said only that defendant "molested me." The next day, T.D. took K.D. to see a counselor, who told them to contact the Child Protective Services division of the State Department of Social Services. T.D. and K.D. did so and later cooperated with the police in their investigation of defendant. T.D. also gave the police K.D.'s August 13, 2017 letter explaining in more detail defendant's assault.

On cross-examination, T.D. acknowledged that she told a police detective that K.D. always seemed happier when defendant was present in the house. T.D. also testified that K.D. may have told her, when she first disclosed defendant's sexual assault, that he threw her on the bed and stuck his tongue down her throat.

## C. Fresh Complaint Witnesses.

Three of K.D.'s relatives testified that K.D. disclosed defendant's sexual assault on separate occasions long before trial.

R.D., K.D.'s cousin, testified that K.D. disclosed defendant's sexual assault on two occasions, once in 2015 and again in 2018. The first time, K.D. told R.D. that defendant exposed himself to her when she was six years old and "molested" her when she was seven years old. In 2018, K.D. gave R.D. a more detailed and emotional account of the event, disclosing that while T.D. was away, defendant took her into T.D.'s bedroom, placed her on the bed, removed her pants, and touched her genitals.

L.M., K.D.'s stepsister[4] and very close friend, testified that during her Thanksgiving 2016 visit to K.D. and T.D.'s house, K.D. told L.M. and a few other relatives that defendant sexually assaulted her in T.D.'s bedroom while T.D. was visiting K.D.'s great-grandfather in the hospital. When disclosing this information, K.D. was distraught and appeared to be having a panic attack. L.M. instructed K.D. to tell her mother and warned that if she did not do so within three months, L.M. would tell her mother.

A.H., K.D.'s older sister, testified that she was also present on Thanksgiving 2016 when K.D. emotionally disclosed defendant's sexual assault. A.H. also testified that she previously learned from her mother that defendant exposed himself to K.D. on two occasions.

**D.     Expert Testimony on CSAAS.[5]**

Blake Carmichael, Ph.D., a psychologist at the UC Davis Children's Hospital, gave expert testimony regarding CSAAS, explaining that its purpose is to dispel certain common "myths and misconceptions" about child sexual abuse victims and their apparent reluctance to disclose their abuse. Dr. Carmichael explained each of CSAAS's five components: secrecy, helplessness, entrapment and accommodation, delayed and unconvincing disclosure, and retraction and recantation. Briefly stated, this syndrome is a consequence of the fact that the sexual abuser of a child is often an older person with whom the child has an ongoing relationship. The abuser often manipulates the child by, among other things, threatening him or her emotionally or physically in order to maintain secrecy. The child victim, in turn, feels afraid and helpless and, thus, will often delay reporting the sexual

---

[4] T.D. is L.M.'s guardian. However, K.D. and L.M. are not actual blood relatives.

[5] "CSAAS" refers to child sexual abuse accommodation syndrome.

6

abuse, give vague or incomplete descriptions, report the abuse over time in a piecemeal fashion, and/or recant his or her disclosures.

Dr. Carmichael had no opinion as to whether K.D. was sexually abused and, in fact, did not know any of the specifics of this case.

## II. *Defense Case.*

Defendant adamantly denied molesting or exposing his penis to K.D. Defendant described himself as the victim in this case, of a "false allegation" and a "besmirched reputation." Nonetheless, as discussed in greater detail *post* (see discussion, part II), defendant admitted "it's possible" that he told Detective Perry when interviewed that "maybe you did touch the victim in the wrong place while you were playing in the backyard." Further, when asked whether he told Detective Perry "something about pulling the front waistband of your sweats away from your body sort of in her presence," defendant responded, "I was under pressure then. I can't answer that question, honestly."

Defendant acknowledged his conviction in 2008 for an incident of domestic violence against T.D. and his "issue" with drinking that led to "a few DUIs."[6]

## III. *Jury Verdict, Sentencing and Appeal.*

On June 12, 2019, the jury found defendant guilty as charged and found true both enhancements. Defendant, sentenced to the midterm of eight years, has timely appealed.

## DISCUSSION

Defendant raises three instructional challenges on appeal: (1) defense counsel provided ineffective legal assistance by failing to request an

---

[6] "DUI" is shorthand for the offense of driving under the influence of alcohol or drugs. (See Veh. Code, § 23152.)

instruction limiting the purposes for which the jury could consider "fresh complaint" evidence; (2) instructing the jury on CALCRIM No. 361 was prejudicial error because it lacked a factual basis in the record; and (3) CALCRIM No. 1193, as written, violates the constitutional guarantee of due process by reducing the prosecution's burden of proof. We address each argument in turn.

## I. *Ineffective Assistance: Failing to Request a Limiting Instruction Based on the Fresh Complaint Doctrine.*

Defendant contends his constitutional right to effective assistance of counsel was violated when his trial counsel failed to request an instruction limiting the purposes for which the jury could consider K.D.'s statements to her relatives (T.D., R.D., A.H., and L.M.) disclosing defendant's sexual assault.

To prevail on a claim of ineffective assistance of counsel, "the defendant must show counsel's performance fell below a standard of reasonable competence, and that prejudice resulted." (*People v. Anderson* (2001) 25 Cal.4th 543, 569.) "Prejudice" in this context occurs only where defense counsel's deficient performance " 'so undermined the proper functioning of the adversarial process' " that the outcome cannot be deemed reliable. (*People v. Kipp* (1998) 18 Cal.4th 349, 366, quoting *Strickland v. Washington* (1984) 466 U.S. 668, 686 (*Strickland*).)

In applying this standard (hereinafter, *Strickland* standard), the defendant must overcome a strong presumption that counsel's conduct was sound legal strategy or otherwise within the wide range of reasonable professional assistance. (*People v. Burnett* (1999) 71 Cal.App.4th 151, 180; *People v. Bunyard* (1988) 45 Cal.3d 1189, 1215.) "Defendant's burden is difficult to carry on direct appeal, as we have observed: ' "Reviewing courts will reverse convictions [on direct appeal] on the ground of inadequate

8

counsel only if the record on appeal affirmatively discloses that counsel had no rational tactical purpose for [his or her] act or omission." ' [Citation.]" (*People v. Lucas* (1995) 12 Cal.4th 415, 437.)

If "defendant has failed to show that the challenged actions of counsel were prejudicial, a reviewing court may reject the claim on that ground without determining whether counsel's performance was deficient." (*People v. Kipp, supra*, 18 Cal.4th at p. 366.)

Relevant here, the fresh complaint doctrine provides that "proof of an extrajudicial complaint, made by the victim of a sexual offense, disclosing the alleged assault, may be admissible for a limited, nonhearsay purpose—namely, to establish the fact of, and the circumstances surrounding, the victim's disclosure of the assault to others—whenever the fact that the disclosure was made and the circumstances under which it was made are relevant to the trier of fact's determination as to whether the offense occurred." (*People v. Brown* (1994) 8 Cal.4th 746, 749–750 (*Brown*).) Thus, the jury may consider this evidence "for the purpose of corroborating the victim's testimony, but not to prove the occurrence of the crime." (*People v. Ramirez* (2006) 143 Cal.App.4th 1512, 1522.) "So long as the evidence that is admitted is carefully limited to the fact that a complaint was made, and to the circumstances surrounding the making of the complaint, thereby eliminating or at least minimizing the risk that the jury will rely upon the evidence for an impermissible hearsay purpose, admission of such relevant evidence should assist in enlightening the jury without improperly prejudicing the defendant." (*Brown, supra*, at p. 762.)

Here, the record is silent as to why defense counsel failed to request a limiting instruction clarifying that the fresh complaint testimony offered by K.D.'s relatives could be considered only to establish the fact that K.D.

disclosed the alleged crime and the circumstances of her disclosure, and not to prove the crime occurred. This silent record generally forecloses an ineffective assistance claim on direct appeal. (*People v. Lucas, supra*, 12 Cal.4th at p. 437.) However, defendant argues that his claim should survive here because there can be no conceivable tactical justification for his counsel's failure.

Defendant's argument bears some weight. The California Supreme Court has made clear: "The specific relevance of the extrajudicial-complaint evidence . . . must be shown in every case." (*Brown, supra*, 8 Cal.4th at p. 763.) However, as mentioned, the *Strickland* standard has two prongs— deficient performance by counsel and prejudice. (*People v. Kipp, supra*, 18 Cal.4th at p. 366.) On this record, even assuming deficient performance, we would find no prejudice.

First, notwithstanding the absence of a limiting instruction, in each instance K.D.'s relatives provided brief testimony that did no more than state the fact of her disclosure of the alleged crime and the basic circumstances surrounding her disclosure.[7]

Moreover, defendant himself relied on these disclosures and the fact that K.D. made them so many years after he allegedly assaulted her to label her claim false. As such, the fresh complaint (or, rather, not-so-fresh complaint) evidence in part supported his primary defense. (See *Brown, supra*, 8 Cal.4th at p. 762 ["in many cases it will be the *defendant* who believes that the particular circumstances under which the victim reported the alleged offense—either promptly after the offense is alleged to have

---

[7] Defense counsel cross-examined A.H. in more detail regarding the fact that she told a detective that she knew from her mother of two incidents of defendant's exposing himself to K.D.

occurred or at some later date—cast doubt upon the veracity of the victim's charge, and the defendant will be entitled to introduce and rely upon such evidence in seeking to undermine the prosecution's case"].)

Finally, there was significant evidence corroborating K.D.'s claim and little evidence undermining it. K.D. provided strong, detailed and consistent testimony regarding the sexual assault that was not seriously impeached. T.D. corroborated K.D.'s statements about the evening of the crime, including the fact that T.D. was at the hospital during her grandfather's passing. T.D. also described in detail another incident wherein she found defendant, in the middle of the night, in the hallway with his hands in front of his sweat pants while K.D. cowered in fear by the wall. Defendant unconvincingly explained that he thought he was exposing himself to T.D., and T.D. ordered him to leave the house. Defendant returned to the house about a year later, only after telling T.D. that he "didn't mean to do it" and that "it would never happen again."

Given the weight of incriminating evidence and the limited nature of the fresh complaint testimony, we conclude any error in the failure to seek a limiting instruction as to such testimony was harmless. (See *Strickland, supra*, 466 U.S. at p. 686.)

## II. *Instruction on CALCRIM No. 361.*

Defendant contends the trial court prejudicially erred by instructing the jury per CALCRIM No. 361: "If the defendant failed in his testimony to explain or deny evidence against him, and if he could reasonably be expected to have done so based on what he knew, you may consider his failure to explain or deny in evaluating that evidence. Any such failure is not enough by itself to prove guilt. The People must still prove the defendant guilty

11

beyond a reasonable doubt. [¶] If the defendant failed to explain or deny, it is up to you to decide the meaning and importance of that failure."

"A party is entitled to a requested instruction if it is supported by substantial evidence.  [Citation.]  Evidence is '[s]ubstantial' for this purpose if it is 'sufficient to "deserve consideration by the jury," that is, evidence that a reasonable jury could find persuasive.'  [Citation.]" (*People v. Ross* (2007) 155 Cal.App.4th 1033, 1049–1050.)  We review a claim of instructional error de novo, considering the instruction in the context of the entire jury charge. (*People v. Posey* (2004) 32 Cal.4th 193, 218.)

CALCRIM No. 361 is based on Evidence Code section 413, which provides:  "In determining what inferences to draw from the evidence or facts in the case against a party, the trier of fact may consider, among other things, the party's failure to explain or to deny by his testimony such evidence or facts in the case against him, or his willful suppression of evidence relating thereto, if such be the case."

As defendant notes, however, CALCRIM No. 361 "applies only when a defendant completely fails to explain or deny incriminating evidence, or claims to lack knowledge and it appears from the evidence that the defendant could reasonably be expected to have that knowledge." (*People v. Cortez* (2016) 63 Cal.4th 101, 118; accord, *People v. Grandberry* (2019) 35 Cal.App.5th 599, 606 [" 'It is an elementary principle of law that before a jury can be instructed that it may draw a particular inference, evidence must appear in the record which, if believed by the jury, will support the suggested inference' "], quoting *People v. Saddler* (1979) 24 Cal.3d 671, 681 (*Saddler*).) Defendant contends this standard is not met here because he did not fail in testimony to explain or deny any evidence against him.

We conclude that substantial evidence supported the trial court's giving of CALCRIM No. 361. The record shows that defendant failed to explain or deny an incriminating fact that was peculiarly within his knowledge to address: Specifically, defendant adamantly denied exposing his penis to K.D. Yet, on cross-examination, defendant acknowledged that it was "possible" that T.D. confronted him about exposing himself to K.D. and that he admitted doing so. He also responded, "It's possible," when asked whether he told Detective Joseph Perry that "maybe you did touch [K.D.] in the wrong place while you were playing in the backyard; do you recall that?" Then, when asked whether he touched K.D.'s genitals on this occasion, defendant responded that he "really doubt[ed] it" but that he "guess[ed]" it was true that he told Detective Perry he "possib[ly]" touched K.D.'s genitals. This colloquy continued:

"Q. . . . [¶] And you initially told Detective Perry that you did not expose yourself to [K.D.], but later you sort of explained something about pulling the front waistband of your sweats away from your body sort of in her presence; do you recall that?

"A. I can't remember.

"Q. You can't remember telling him that or you can't remember doing that?

"A. I can't remember.

"Q. Both things?

"A. I can't remember doing it."

Then, after some effort by the prosecutor to phrase a proper question, the colloquy continued:

"Q. Back when you talked to Detective Perry did you have a memory of pulling—

13

"A.    I was under pressure then.  I can't answer that question, honestly.

"Q.    But it was something that you said you did?

"A.    Like I said, I was under pressure.

"Q.    And you said that it was the stupidest thing that you had ever done and you don't even know why you did it.  Do you recall that?

"A.    It's possible."

On this record, CALCRIM No. 361 was appropriate.  (See *People v. Cortez, supra*, 63 Cal.4th at p. 121 [where a defendant claims he or she "did not know" information that he or she "could reasonably be expected to know" from the evidence, the instruction is appropriate].)  Defendant's nonanswer when asked to explain why he previously told a law enforcement agent that he "possibly" sexually abused K.D. while he unequivocally denied any such abuse at trial is significant.  Indeed, defendant went so far as to admit it was "possible" that he told the detective this incident was the "stupidest thing" he had ever done—yet he was unsure whether this "thing" happened.  The jury was entitled to weigh this testimony against defendant.

Defendant argues that the instruction should not have been given because the two bases offered for giving it—his alleged statements to Detective Perry regarding a backyard "horseplay" incident and a possible act of indecent exposure—were not evidence against him because Detective Perry did not testify and his interview of defendant was not introduced at trial. However, notwithstanding Detective Perry's absence from trial, defendant provided evidence in the form of his own testimony regarding his interview by the detective.  Moreover, his own authority (*People v. Grandberry, supra*, 35 Cal.App.5th at pp. 608–609) makes clear that CALCRIM No. 361 is appropriate where the defendant fails to explain or deny any fact of evidence

14

*that was within the scope* of relevant cross-examination—not just those facts actually adduced at trial.

Finally, even if we were to reach the opposite conclusion regarding the applicability of CALCRIM No. 361, we would find no prejudice here. "[G]iving an irrelevant or inapplicable instruction is generally ' "only a technical error which does not constitute ground for reversal." ' " (*People v. Cross* (2008) 45 Cal.4th 58, 67.) CALCRIM No. 361 permitted, but did not require, the jury to draw an adverse inference from defendant's testimony, and only then if the jury first made the required findings that he failed to explain or deny certain evidence and that he could have reasonably been expected to provide such explanation or denial. In addition, the instruction explicitly stated that defendant's failure to explain or deny such evidence was not sufficient by itself to establish his guilt.

Moreover, in addition to the standard instructions on the presumption of innocence and the prosecutor's burden to prove guilt beyond a reasonable doubt, the trial court instructed the jury under CALCRIM No. 200, "Some of these instructions may not apply, depending on your findings about the facts of the case. . . . After you have decided what the facts are, follow the instructions that do apply to the facts as you find them." We presume the jury followed these instructions. (*People v. Fuiava* (2012) 53 Cal.4th 622, 669.) Thus, even assuming for the sake of argument that defendant is correct that CALCRIM No. 361 was not applicable here, the jury, following CALCRIM No. 200, would have disregarded it.

Last, defendant labels this case a credibility contest between K.D. and himself. Yet the fact remains that K.D. gave a detailed and credible description of defendant's crime, which was consistent with the descriptions she gave earlier to her mother and her close relatives. At trial, despite

15

defendant's efforts, K.D.'s credibility was never seriously undermined. Moreover, her mother gave corroborating testimony regarding her absence on the night K.D. was molested, confirming she was at the hospital with her dying grandfather. Under these circumstances and in light of the careful and complete set of instructions read to the jury, we find no reasonable probability that but for the giving of CALCRIM No. 361 defendant would have received a more favorable result. (See *Saddler, supra*, 24 Cal.3d at p. 684; *People v. Covarrubias* (2016) 1 Cal.5th 838, 934.)

### III. *Instruction on CALCRIM No. 1193.*

Defendant contends that CALCRIM No. 1193, as written, violates the constitutional guarantee of due process by reducing the prosecution's burden of proof.[8] CALCRIM No. 1193, as read to the jury, provided: "You have heard testimony from Dr. Blake Carmichael regarding [CSAAS]. Dr. Carmichael's testimony about [CSAAS] is not evidence that the defendant committed any of the crimes charged against him. You may consider this evidence only in deciding whether or not [K.D.'s] conduct was not inconsistent with the conduct of someone who has been molested and in evaluating the believability of his [*sic*] testimony."

As reflected in this instruction, "CSAAS expert testimony is not admissible to prove the complaining witness has in fact been sexually abused. (*People v. McAlpin* (1991) 53 Cal.3d 1289, 1300 [283 Cal.Rptr. 382, 812 P.2d 563].) It is admissible to rehabilitate such witness's credibility when the

---

[8] We reject the People's argument that defendant forfeited the right to challenge CALCRIM No. 1193 by failing to object to it below. "Generally speaking, a 'failure to object does not waive an instructional error on appeal if the instruction was an incorrect statement of law or the defendant's substantial rights were affected.'" (*People v. Grandberry, supra*, 35 Cal.App.5th at p. 604.)

16

defendant suggests that the child's conduct after the incident is inconsistent with her testimony claiming molestation. (*Ibid.*) Such testimony is needed to disabuse jurors of commonly held misconceptions of child sexual abuse and the abused child's seemingly self-impeaching behavior. (*Id.* at p. 1301.)" (*People v. Gonzales* (2017) 16 Cal.App.5th 494, 503 (*Gonzales*).)

Defendant contends CALCRIM No. 1193 violates due process because it contains "self-contradictory language . . . [that] set[s] the jurors on the impossible task of finding the complainant believable while at the same time remaining open to a doubt that the molestation in this case actually occurred."

Initially, we agree with defendant that because juries may assign undue weight to an expert's opinion, "special care must be taken to insure [*sic*] the jury understands its duty to independently assess the expert opinion along with and in light of all other relevant evidence." (*People v. Housely* (1992) 6 Cal.App.4th 947, 958.) However, the language of CALCRIM No. 1193 itself provides necessary protection against juror misuse of CSAAS testimony. As set forth *ante*, CALCRIM No. 1193 contained two restrictions. First, it forbade the use of CSAAS testimony as "evidence that the defendant committed any of the crimes charged against him." Second, it restricted the use of CSAAS testimony to "deciding whether or not [K.D.'s] conduct was not inconsistent with the conduct of someone who has been molested and in evaluating the believability of his [*sic*] testimony."

Thus, defendant is wrong to claim CALCRIM No. 1193 "fails to convey to the jurors the simple message that CSAAS testimony is meant only to dispel the myth that delayed disclosure is per se evidence of untruthfulness, and nothing more." To the contrary, this message is embedded in the instruction's very language: Otherwise stated, "A reasonable juror would

17

understand CALCRIM No. 1193 to mean that the jury can use [CSAAS] testimony to conclude that [the complainant's] behavior does not mean she lied when she said she was abused.  The jury also would understand it cannot use [this] testimony to conclude [the complainant] was, in fact, molested.  The CSAAS evidence simply neutralizes the victim's apparently self-impeaching behavior.  Thus, under CALCRIM No. 1193, a juror who believes [the expert's] testimony will find both that [the complainant's] apparently self-impeaching behavior does not affect her believability one way or the other, and that the CSAAS evidence does not show she had been molested.  There is no conflict in the instruction." (*Gonzales, supra*, 16 Cal.App.5th at p. 504; accord, *People v. Munch* (2020) 52 Cal.App.5th 464, 474.)

Indeed, defendant theorized at trial, and continues to argue on appeal, that K.D. lacks credibility and may have a "false memory" of the single charged act of abuse, noting both the length of time she delayed reporting it and the fact that, afterward, she continued to live in the same house with him off and on for several years.  As courts have recognized, this is just the sort of case where CSAAS testimony proves helpful, as it tends to show "such delayed reporting is not inconsistent with the secretive environment often created by an abuser who occupies a position of trust." (*People v. Bowker* (1988) 203 Cal.App.3d 385, 393–394 [warning that CSAAS testimony should "be targeted to a specific 'myth' or 'misconception' suggested by the evidence"].)  Moreover, Dr. Carmichael was not asked to offer an opinion on whether K.D.'s behavior was typical of abuse victims, "an issue closely related to the ultimate question of whether abuse actually occurred." (*People v. Housely, supra*, 6 Cal.App.4th at p. 958; cf. *People v. Bowker, supra*, 203 Cal.App.3d at pp. 394–395 [error in admitting CSAAS testimony where the expert testified to more than the "popular myths" debunked by CSAAS and

the jury was not instructed that his testimony was admissible solely for the purpose of showing that the victim's reactions were not inconsistent with having been molested].)  Rather, Dr. Carmichael expressly warned that CSAAS does not provide a "tool checklist that will say a kid was abused," adding "that's why again we have the legal process."

Finally, defendant focuses on CALCRIM No. 1193's language that CSAAS testimony is not evidence that he committed "the crimes *charged against him*."  According to defendant, because this language does not preclude the use of CSAAS testimony as proof he committed any of the uncharged offenses (including the 10 or so times he allegedly exposed himself to K.D.), the jury could have inferred based on an uncharged offense that he was inclined to commit sexual crimes.  This, defendant argues, lessened the prosecution's burden of proving him guilty on the charged offense beyond a reasonable doubt.

An identical argument was addressed and rejected in *Gonzales*.  Considering the language of CALCRIM No. 1193 as a whole, the *Gonzales* court noted that "the only use of evidence of the uncharged offenses is as evidence Gonzales committed the charged offenses.  Thus, use of the CSAAS testimony as evidence Gonzales committed the uncharged offenses would violate the instruction that CSAAS testimony is not evidence he committed the charged offenses.  Moreover, [the expert's] testimony made it clear CSAAS evidence is not evidence Gonzales did anything charged or uncharged." (*Gonzales, supra*, 16 Cal.App.5th at p. 504.)

This reading of CALCRIM No. 1193 comports with ours.  Moreover, as in *Gonzales*, Dr. Carmichael testified that he had no opinion as to whether defendant committed the charged offense and, in fact, did not know the specific facts of this case.  Under these circumstances, we disagree with

19

defendant that CALCRIM No. 1193 functioned to lessen the prosecution's burden to prove guilt beyond a reasonable doubt. Thus, because the trial court's instruction was "clear, accurate and sufficient" (*People v. Gilbert* (1992) 5 Cal.App.4th 1372, 1387), defendant's challenge fails.

## DISPOSITION

The judgment is affirmed.

_____
Jackson, J.

WE CONCUR:


_____
Fujisaki, Acting P. J.


_____
Petrou, J.


A158243/*People v. Roy Linn Tidwell*